## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| **CALEB MICHAEL MCLEOD**, | ) | |
| | ) | |
| **Plaintiff** | ) | |
| | ) | |
| **v.** | ) | **CIVIL ACTION NO.** |
| | ) | **2:13-CV-00967-KOB** |
| | ) | |
| **CAROLYN W. COLVIN**, | ) | |
| **Acting Commissioner of Social** | ) | |
| **Security Administration** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION

## I. INTRODUCTION

On March 17, 2009, the claimant, Caleb McLeod, applied for supplemental security

income under Title XVI of the Social Security Act. The claimant alleges disability commencing

on December 22, 2008, because of diabetes and depression. The Commissioner denied the claim

both initially and on reconsideration. The claimant filed a timely request for a hearing before an

Administrative Law Judge, and the ALJ held a hearing on July 26, 2011. (R. 23).

In a decision dated October 25, 2011, the ALJ found that the claimant was not disabled as

defined by the Social Security Act and, thus, was ineligible for supplemental security income. (R.

35). On March 19, 2013, the Appeals Council denied the claimant's request for review;

consequently, the ALJ's decision became the final decision of the Commissioner of the Social

Security Administration. (R. 1). The claimant has exhausted his administrative remedies, and this

court has jurisdiction pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3). For the reasons as fully

stated below, this court reverses and remands the decision of the Commissioner because substantial evidence does not support the AlJ's findings regarding the claimant's mental limitations.

## II. ISSUE PRESENTED

The issue before the court is whether the ALJ's findings regarding the claimant's mental limitations are supported by substantial evidence.  Specifically, did the ALJ fail to adequately develop the record by not re-contacting Dr. Blotcky or ordering an additional consultative examination from a qualified psychiatrist or psychologist after finding inconsistencies in Dr. Blotcky's medical opinion?

## III. STANDARD OF REVIEW

The standard of review of the Commissioner's decision is limited. This court must affirm the Commissioner's decision if the Commissioner applied the correct legal standards and if the factual conclusions are supported by substantial evidence. *See* 42 U.S.C. § 405(g); *Graham v. Apfel*, 129 F.3d 1420, 1422 (11th Cir. 1997); *Walker v. Bowen*, 826 F.2d 996, 999 (11th Cir. 1987).

"No... presumption of validity attaches to the [Commissioner's] legal conclusions, including determination of the proper standards to be applied in evaluating claims." *Walker*, 826 F.2d at 999. This court does not review the Commissioner's factual determinations *de novo*. The court will affirm those factual determinations that are supported by substantial evidence. "Substantial evidence" is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 401 U.S. 389, 402 (1971).

The court must keep in mind that opinions, such as whether a claimant is disabled, the

nature and extent of a claimant's residual functional capacity, and the application of vocational factors, "are not medical opinions, ... but are, instead, opinions on issues reserved to the Commissioner because they are administrative findings that are dispositive of a case; i.e, that would direct the determination or decision of disability." 20 C.F.R. §§ 404.1527(e), 416.927(d). Whether the Plaintiff meets the listing and is qualified for Social Security disability benefits is a question reserved for the ALJ, and the court "may not decide facts anew, reweigh the evidence, or substitute [its] judgment for that of the Commissioner." *Dyer v. Barnhart,* 395 F.3d 1206, 1210 (11th Cir. 2005). Thus, even if the court were to disagree with the ALJ about the significance of certain facts, the court has no power to reverse that finding as long as substantial evidence in the record supports the finding.

The court must "scrutinize the record in its entirety to determine the reasonableness of the [Commissioner]'s factual findings." *Walker*, 826 F.2d at 999. A reviewing court must not look only to those parts of the record that support the decision of the ALJ, but also must view the record in its entirety and take account of evidence that detracts from the evidence relied on by the ALJ. *Hillsman v. Bowen*, 804 F.2d 1179, 1180 (11th Cir. 1986).

## IV. LEGAL STANDARD

Under 42 U.S.C. § 423(d)(1)(A), a person is entitled to disability benefits when the person cannot "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). To make this determination, the Commissioner employs a five-step, sequential evaluation process:

3

(1) Is the person presently unemployed?
(2) Is the person's impairment severe?
(3) Does the person's impairment meet or equal one of the specific impairments
set forth in 20 C.F.R. Pt. 404, Subpt. P, App. 1?
(4) Is the person unable to perform his or her former occupation?
(5) Is the person unable to perform any other work within the economy?

An affirmative answer to any of the above questions leads either to the next
question, or, on steps three and five, to a finding of disability. A negative answer
to any question, other than step three, leads to a determination of "not disabled."

*McDaniel v. Bowen*, 800 F.2d 1026, 1030 (11th Cir. 1986); 20 C.F.R. § 404.1520, 416.920.

The ALJ commits reversible error if he exercises his discretion not only to make a

determination of disability but also to disregard medical evidence in favor of his own

impressions. "An ALJ...abuses his discretion when he substitutes his own uninformed medical

evaluations for those of a claimant's treating physicians." *Marybury v. Sullivan*, 957 F.2d 837,

840 (11th Cir. 1991) (Johnson concurring).

While the burden rests with the claimant to prove a disability, the ALJ has a duty to

develop a full and fair record. *Ellison v. Barnhart*, 355 F.3d 1272, 1276 (11th Cir. 2003); 20

C.F.R. § 416.912(c). When the evidence shows that the claimant has a mental impairment, the

ALJ may determine that the claimant is not disabled "'only if the [ALJ] has made every

reasonable effort' to obtain the opinion of a 'qualified psychiatrist or psychologist.'" *McCall v.*

*Bowen*, 846 F.2d 1317, 1320 (11th Cir. 1988) (quoting 42 U.S.C.A. § 421(h)); *see also* 20 C.F.R. §

416.903(e).

Under the law at the time of the ALJ's decision in this case, for an ALJ to have a duty to

re-contact, the person sought to be re-contacted must be a treating source; the treating source's

opinion must be unclear on an issue reserved for the commissioner; and the ALJ must not be

able to ascertain the basis for the opinion from the record. *See* SSR 96-5p.  A treating source is "your own physician, psychologist, or other acceptable medical source." 20 C.F.R. § 404.1502. An acceptable medical source does not include a physician's assistant. *See* 20 C.F.R. § 404.1513(a)(1)-(5).[1]

His duty to fully develop the record "requires the ALJ to order a consultative evaluation when such an evaluation is necessary to make an informed decision." *Smith v. Commissioner*, 501 F. App'x. 875, 878 (11th Cir. 2012).  The ALJ's duty to order a consultative examination can be triggered when an inconsistency in the evidence exists or the medical record as a whole does not support a determination on the disability claim. 20 C.F.R. § 416.903(a); 20 C.F.R. § 416.919. However, the ALJ does not err in denying a request for a consultative examination if substantial evidence otherwise supports the ALJ's decision. *Holladay v. Bowen*, 848 F.2d 1206, 1209-10 (11th Cir. 1988); *see also Reeves v. Heckler*, 734 F.2d 519, 522 n.1 (11th Cir. 1984).

## V. FACTS

The claimant has a tenth grade education and was twenty-one years old at the time of the administrative hearing. (R. 46, 49). His past work experience includes employment as a loader/unloader and as a general construction laborer. (R. 34). The claimant alleged he was disabled because of diabetes and depression. (R. 195).

### Physical Limitations

While the issue deals primarily with the claimant's mental limitations, as discussed below,

---

[1]  As of March 26, 2012, the law changed and  imposes no duty on the ALJ to re-contact but gives him the *discretion* to re-contact a "treating physician, psychologist, or other medical source."  *See* 20 C.F.R. § 404.1520b(c)(1).

the claimant suffered some minor physical limitations. In October 2001, at Children's Hospital, the claimant was eleven years old when doctors diagnosed him with diabetes mellitus, type 1, juvenile onset, insulin-dependent. (R. 309). The claimant visited UAB Medical West Emergency Room nine times between November 2006 and December 2008, for noncomplying with his prescribed insulin treatment. Additionally, the claimant visited Southlake Medical Center's Emergency Room four times in 2009 while living in Florida. All four hospitalizations were because the claimant was not following his prescribed diabetic treatment of NovoLog and Lantus insulin. The claimant told the doctors that he could not afford his prescribed treatment. Doctors prescribed more insulin treatment for the claimant and advised him to receive his insulin through the Department of Health's free insulin program. (R. 279-310, 400-07).

*Mental Limitations*

From October 6, 2004 through June 2, 2005, the claimant resided at SafetyNet Youth Academy in Minter, Alabama upon order of the Family Court for leaving his parent's home without permission; noncompliance with his dietary program; behavioral issues at school and home; and not receiving needed care at home. On the day of admittance, SafetyNet[2] noted that the claimant had a history of problems including falsifying his blood sugar levels; disrespecting his parents and teachers; and spitting in the face of another student. Furthermore, SafetyNet obtained medical records that, on September 9, 2004, Dr. Williamson[3] completed a psychiatric evaluation on the claimant; diagnosed the claimant with Oppositional Defiance Disorder; and

---

[2]SafetNet's records consistently failed to articulate which staff member observed these admission findings, or do so with readable signatures.

[3]Records provided to the court do not give details regarding where Dr. Williamson works.

prescribed Lexapro after the claimant asked for medication to control his anger problems.

However, the claimant told Mr. Hahn that he did not take the Lexapro prescribed by Dr.

Williamson because he did not feel like he needed it. (R. 357-86).

On December 14, 2004, Daniel Hoke, a Ph.D and licensed professional counselor for

SafetyNet, evaluated the claimant. Dr. Hoke administered a Minnesota Multiphasic Personality

Inventory Test for adolescents, and a Children's Depression Inventory Test on the claimant. Test

results showed that the claimant did not suffer any significant psychopathology or emotional

disturbance, including no depression. Dr. Hoke indicated that the claimant's teacher completed a

rating scale on the claimant that supported Dr. Hoke's finding that the claimant suffered from

oppositional defiance disorder. Additionally, Dr. Hoke noted that the claimant continued having

behavioral problems while at SafetyNet. Dr. Hoke recommended that, after the claimant's

discharge from SafetyNet, he should receive continuous monitoring and assessments to ensure

his medical needs are met. (R. 396-98).

Between April 2005 and May 2005, SafetyNet staff members evaluated the claimant's

behavioral progress. To help the claimant overcome his behavioral problems, SafetyNet and the

claimant set goals implementing a process of monitoring and assessing the claimant's behavior;

recognizing and verbalizing how feelings are connected to misbehavior; expressing anger through

appropriate verbalizations and healthy physical outlets; and decreasing the frequent hostility with

parents and adults. (R. 377). A Licensed Graduate Social Worker for SafetyNet evaluated the

claimant and determined that the claimant successfully implemented a process monitoring his

behavior; decreased hostility towards adults and his parents; and accepted responsibility. The

claimant's supervisor indicated that the claimant's attitude change in taking  responsibility for his

7

own actions allowed the claimant to achieve his goals. (R. 375-78).

On June 2, 2005, SafetyNet discharged the claimant, indicating that the claimant continued to not comply with his medication and treatment for his diabetes, but showed improvement in taking responsibility and with his anger issues. Additionally, SafetyNet noted that the claimant occasionally fought with his peers, but for the most part, he got along well with other SafetyNet students. SafetyNet recommended that the claimant continue receiving mental health treatment, in addition to receiving individual and family counseling. (R. 357-359, 383).

Between November 2006 and December 2008, UAB Medical West Hospital admitted the claimant nine times. Within those nine hospitalizations, the claimant was treated for oppositional defiance disorder; personality disorder; depression; and several physical impairments. On the claimant's November 27, 2007 discharge, Dr. Charles Skoog, Jr., a physician at UAB Medical West, diagnosed the claimant with a personality disorder and told him to continue taking Lexapro. However, the claimant indicated on December 21, 2008, to Dr. Christopher Portante, a physician at UAB, that Lexapro did not help cure his mental disorders, and Dr. Portante took the claimant off Lexapro and prescribed Zoloft. (R. 279-310).

On July 15, 2009, Jacqueline McLeod, the claimant's aunt with whom he lives, filled out an Adult Third Party Function Report that explained how the claimant's illnesses, injuries, or conditions limited his activities. Ms. McLeod noted that the claimant sometimes got along with authority figures and that the claimant spent time with others on a weekly basis; however, Ms. McLeod acknowledged that the claimant's unpredictable behavior caused by depression, oppositional defiance disorder, and bipolar disorder led to his inability to get along with others and follow instructions.  Ms. McLeod stated that the claimant's diabetes limited his daily

activities, but that he could still dress, bath, shave, and use the restroom by himself. Additionally in the report, Ms. McLeod acknowledged that the claimant could prepare simple meals; complete some indoor and outdoor household chores; go out on his own; and shop for groceries and personal needs. However, Ms. McLeod noted that the claimant's physical abilities of lifting, standing, walking, climbing stairs, and seeing are limited by his diabetes. (R. 202-08).

The Social Security Administration secured two Psychiatric Review Technique forms from non-examining state agency psychologists.  Dr. Sharon Ames-Dennard completed a from on July 31, 2009, and Dr. J. Patrick Peterson completed a form on January 9, 2010.   In their forms, both psychologists concluded that the claimant did not meet the requirements for disability benefits because insufficient evidence existed in the record to show that he is disabled. They also noted that the claimant was not cooperative in providing further evidence to them by failing to appear at consultative exams and not returning phone calls. (R. 328-41, 343-56).

On February 4, 2011, Dr. Alan Blotcky, a psychologist at Alabama Psychotherapy and Wellness Center, performed a psychological evaluation on the claimant at the request of the claimant's attorney. Dr. Blotcky's evaluation included four procedures: an evaluation of the claimant; the Wechsler Adult Intelligence Scale, Fourth Edition (WAIS-IV); the Wechsler Individual Achievement Test, Second Edition (WIAT-II); and a Beck Depression Inventory. The evaluation administered by Dr. Blotcky indicated that the claimant had been depressed since he was eleven years old, had a history of marijuana abuse, and lived with his aunt. The WAIS-IV showed that the claimant received a Full Scale IQ of 80, and led Dr. Blotcky to find that the claimant suffered from a learning disorder.

The WIAT-II showed that the claimant suffered from a mathematics and written

expression disorder. Dr. Blotcky noted that the Beck Depression Inventory test showed that the claimant achieved a score of 35, indicating that the claimant suffered from severe depression. Dr. Blocky recommended that the claimant seek psychiatric treatment for a depressive disorder and a personality disorder. Dr. Blotcky acknowledged that the claimant needs care by a psychiatrist and psychologist on a regular and uninterrupted basis, with a combination of medication and counseling. Furthermore, Dr. Blotcky recommended the claimant provide random urine samples for his past marijuana abuse, and to join a substance abuse program if a urine sample testing is positive. (R. 502-06).

On November 17, 2010, Dr. Blotcky completed a supplemental questionnaire at the request of the claimant's attorney. Dr. Blotcky indicated on the form the claimant's degree of limitations in the categories espoused in "paragraph B" criteria for assessing mental impairments. The form defined the level or degrees of limitation:

> MILD: Suspected impairment of slight importance which does not affect ability to function
> MODERATE: An impairment which affects but does not preclude ability to function
> MARKED: An impairment that seriously affects ability to function
> EXTREME: Severe impairment of ability to function.

(R. 1179). After his initial evaluation of the claimant and after examining the medical documents provided to Dr. Blotcky, he opined that the claimant suffered from a *marked* limitation in the following categories: restriction of activities of daily living; difficulty maintaining social functioning; difficulty using judgment in a complex work setting; difficulty with work setting changes; ability to respond to customary work pressures; ability to respond appropriately to supervision in a work setting; ability to respond appropriately to co-workers in a work setting;

10

ability to respond appropriately to customers or other members of the general public in a work setting; ability to maintain concentration, persistence, and pace; and an ability to understand, remember, and carry out detailed or complex instructions. Dr. Blotcky considered the claimant to possess *moderate* limitations in the following areas: ability to understand, carry out, and remember instructions in a work setting; and ability to perform simple tasks in a work setting. (R. 507-08).

On an undisclosed date, the claimant completed an Adult Disability Report, alleging that his depression and being able to walk only half a block before resting limited his ability to work.[4] The claimant alleged in the report that physical impairments and depression made it impossible to complete any tasks at work, thus, leading to the claimant's disability claim filed on December 22, 2008. (R. 195).

### The ALJ Hearing

After the Commissioner denied the claimant's request for supplemental security income, the claimant requested and received a hearing before an ALJ on July 26, 2011. (R. 23). At the hearing, the claimant testified that he could not work for the following reasons: blood sugar always too high or low; weakness; and dehydration. (R. 55). The claimant noted that his diabetes worsened since he last worked in December 2008, as he had no income and no insurance to pay for his own medication. The claimant further noted that he received his medication through his mom, grandfather, and aunt. He stated that he borrows insulin and depression medicine from his mom, medicine from his grandfather, or that his aunt buys the medication if the claimant's mom

---

[4]The claimant did not specify in the report how the depression affected his work.

or grandfather are unable to provide him with medication. Additionally, the claimant testified that his cousin purchases cigarettes for the claimant. The claimant acknowledged that he lived with his aunt, a retired nurse, because his aunt helped the claimant treat his diabetes. (R. 49, 57-59).

The claimant testified that his high blood sugar levels, peptic ulcer disease, and esophageal reflux caused him to throw up at least twice every month. (R. 58, 65). The claimant stated that he could not get his blood sugar levels under control, as the levels constantly fluctuated each time on the machine, from a reading between seventy and "high." The claimant alleged that his high blood sugar levels made him angry, which affected the claimant's relationship with his family. The claimant stated that the high blood sugar levels caused him to wake up screaming and hollering at his family or girlfriend. (R. 58-63).

The claimant testified that he stayed depressed all the time, and had too many bad days during the week to work any job. The claimant noted that he suffered from a learning disability in written expression and math, and asked his aunt for clarification on things the claimant could not comprehend. The claimant testified that he played basketball and tennis in the park, but no longer could run as a diabetic. (R. 64, 66).

A vocational expert, Mr. Eddie Rice, testified concerning the type and availability of jobs that the claimant was able to perform. He stated that the claimant cannot perform past relevant work as a loader/unloader and general construction laborer because both jobs required heavy exertion levels. The ALJ asked Mr. Rice to identify any light work opportunities that he believed the claimant could perform, but with the following limitations: avoid unprotected heights; avoid hazards of moving machinery; avoid exposure of extreme temperatures; avoid complex job tasks; and avoid long and frequent contact with the general public and coworkers. Mr. Rice

responded that under these constraints, the claimant could work as a ticket seller, with 45,000

jobs existing nationally and 880 statewide; a cleaner, with 238,000 nationally and 3,000 statewide;

or an assembler, with approximately 90,000 nationally and approximately 1,075 statewide. Mr.

Rice testified that an employee usually cannot miss more than one day per month in these jobs.

(R. 66-69).

The ALJ asked Mr. Rice to identify employment opportunities that the claimant could

perform assuming the ALJ found that the claimant had the limitations contained in Dr. Blotcky's

opinion. Mr. Rice stated that, given the marked limitations, as well as the moderate limitations

indicated by Dr. Blotcky's evaluation, no employment opportunities existed for the claimant. The

ALJ requested Mr. Rice to identify whether the claimant was capable of performing any work if

the ALJ found the claimant's testimony credible and supported by the record as a whole. Mr.

Rice responded that the claimant could not work, based on the claimant's testimony regarding

his physical and emotional difficulties. (R. 68-69).

*The ALJ's Decision*

On October 25, 2011, the ALJ issued a decision finding the claimant was not disabled

under the Social Security Act. (R. 35). First, the ALJ found that the claimant had not engaged in

substantial gainful activity since the alleged onset of his disability. Next, the ALJ found that the

claimant had the following severe impairments: diabetes mellitus type 1, juvenile onset, insulin-

dependent; depressive disorder; personality disorder; learning disorders in mathematics and

written expression; intellectual abilities at the low end of the low average range; history of

oppositional defiance disorder; and history of marijuana abuse, in self-reported remission.

Additionally, the ALJ found that the claimant had the following non-severe impairments: history

of asthma; gastroesophageal reflux disease and/or peptic ulcer disease; and hepatomegaly. He noted these impairments as non-severe because they constituted only slight abnormalities that cannot be reasonably expected to produce more than minimal work limitations. The ALJ concluded that both the severe and non-severe impairments did not singly or in combination manifest the specific signs and diagnostic findings required by the Listing of Impairments. (R. 26-27).

The ALJ found that the claimant had the residual functional capacity to perform light work, with the following limitations: must avoid working around unprotected heights; must avoid the hazards of moving machinery; must avoid exposure to extremes of temperatures; is limited to the performance of non-complex jobs; and must have brief and infrequent contact with the general public and coworkers. (R. 32).

To support his conclusion, the ALJ first referenced the claimant's allegations concerning the nature, intensity, frequency, and limiting affects of the claimant's physical and mental symptoms. The ALJ found that the claimant's statements concerning the intensity, persistence, and limiting effects of symptoms were not credible. The ALJ noted that the claimant's statements were inconsistent with the residual functional capacity assessment. The ALJ acknowledged that the claimant was hospitalized several times with hyperglycemia and diabetic ketoncidosis. However, the ALJ concluded that the reason the claimant was hospitalized several times was because of his noncompliance with the diabetic regimen. The ALJ further articulated that the claimant did not demonstrate uncontrollable swings of his blood sugar levels in the hospital, and responded well to diabetic treatment, indicating that the claimant would respond well to complying with his diabetic regimen. The ALJ showed that a minimum level of compliance by

14

the claimant has led to no hospital visits within the past year, and allegations of extreme symptoms of hyperglycemia and/or DKA would have required hospitalization. (R. 33).

The ALJ found no evidence of any mental health treatment to support the claimant's alleged mental impairments. The ALJ noted that the claimant occasionally took some psychiatric medications, which were only prescribed after emergency room visits. The ALJ articulated that, while he agreed with Dr. Blotcky's findings that the claimant's diagnostic impressions of depressive disorder, personality disorder, mathematics and written expression, and personality disorder are severe impairments, he rejected Dr. Blotcky's opinion that the claimant had numerous marked limitations. The ALJ further rejected Dr. Blotcky's finding that the claimant had a serious symptomatology through his GAF score of 48. Instead, the ALJ concluded that the evidence in the record supported, at most, a finding of moderate symptomatology since the alleged disability onset date. (R. 33).

Based on the record as a whole, the ALJ concluded that the claimant's subjective allegations of physical and mental limitations were not entirely credible. He noted that although some limitations existed for the claimant, substantial evidence did not support a finding that the objective medical conditions are of such severity that they could reasonably be expected to give rise to the claimant's allegations. Thus, the inconsistency between the objective medical evidence and the claimant's subjective allegations undermined his credibility regarding the severity of his physical and mental symptoms.  (R. 34).

The ALJ next considered the claimant's subjective allegations of pain to determine whether he had the residual functional capacity to perform past relevant work. The ALJ noted that the claimant's past relevant work as a loader/unloader and a general construction laborer

15

required medium or heavy exertional levels. Because the claimant could no longer perform at those required exertional levels, the ALJ concluded that the claimant could not perform past relevant work. (R. 34).

The ALJ considered the claimant's age, education, work experience, and residual functional capacity to determine whether jobs in significant numbers existed in the national economy that the claimant could perform. The ALJ concluded that the claimant had limitations in performing all or substantially all of the requirements for light exertional work. Based on Mr. Rice's testimony, the ALJ found that, given the claimant's capable performance, the claimant could perform occupations that existed in significant numbers in the national economy. He noted that the claimant could perform the following occupations: ticket sales, with 880 jobs existing in Alabama and 45,000 nationally; cleaner, with 3,000 jobs existing in Alabama and 238,000 nationally; and assembler, with approximately 1,075 jobs existing in Alabama and 90,000 nationally. (R. 34-35).  Thus, the ALJ concluded that the claimant was not disabled.

## VI. DISCUSSION

The claimant argues that the ALJ failed to develop the record by failing to re-contact Dr. Blotcky or to order an additional consultative examination from a qualified psychiatrist or psychologist after finding inconsistencies in Dr. Blotcky's medical opinion regarding the claimant's limitations under the "paragraph B" criteria for mental impairments. This court agrees with the claimant and finds that the ALJ's decision is due to be reversed and remanded.

Although the claimant has the burden to prove his disability, the ALJ must fully and fairly develop the record. *Ellison v. Barnhart*, 355 F.3d 1272, 1276 (11th Cir. 2003).  Where a colorable claim for mental impairments exists, the ALJ should ensure that a psychiatrist or psychologist

16

has assessed the claimant's mental limitations.  20 C.F.R. § 416.903(3)

Because the ALJ, at step two in the disability evaluation process, found that the claimant suffered from severe mental impairments, including depressive disorder, personality disorder, and a history of oppositional defiance disorder, the ALJ had a duty to make every effort to obtain the opinion of a qualified psychiatrist or psychologist before making his disability determination. The Social Security Administration attempted to secure two physchological examinations of the claimant prior to the hearing, but the claimant did not return phone calls to set up the appointments; as such, Dr. Ames-Denard and Dr. Peterson both found the record insufficient to make a determination of the claimant's mental limitations.  On February 4, 2011, the claimant's attorney referred the claimant to Dr. Alan Blotcky, a clinical psychologist, for a psychological examination; Dr. Blotcky found that the claimant had severe mental limitations with several marked limitations.  Although the ALJ agreed with Dr. Blotcky's mental diagnoses, the ALJ disregarded his ultimate findings regarding the claimant's mental limitations.

The court notes that the ALJ, in essence, somewhat frowned upon Dr. Blotcky's assessment from the beginning because the claimant's attorney arranged for the assessment with Dr. Blotcky. However, had the claimant's attorney not done so, the ALJ would have no choice but to arrange such an assessment himself, given the fact that the two previous consultations occurred prior to an ALJ hearing, and both consultations did not provide substantial evidence to conclude whether the claimant's mental impairments qualified him as disabled. Given the claimant's serious mental impairments of depressive disorder, personality disorder, and a history of oppositional defiance disorder, having a qualified psychiatrist or psychologist assess the mental limitations caused by the claimant's diagnosed mental impairments was crucial to the ALJ

17

correctly evaluating the claimant's mental limitations.

For the 12 months prior to the claimant's alleged disability onset date of March 17, 2009, the record contains no conclusive medical opinion from a psychiatrist or psychologist as to the limiting effects of his severe mental impairments *other than Dr. Blotcky*. The record contains medical evidence regarding the existence of his severe mental impairments from 2001 through 2008; however, none of those records contains a psychiatrist or psychologist's medical opinion regarding how his mental impairments limit his ability to work. The court acknowledges that the claimant did not cooperate with two state psychological exams administered by the Social Security Administration and understands the importance of the claimant cooperating with consultative exams in determining whether the claimant is disabled. However, the ALJ's reliance of Dr. Blotcky's findings regarding the claimant's diagnoses involving severe mental impairments, but total disregard for his professional judgment regarding the limitations caused by those impairments concerns the court. This concern is compounded by the fact that Dr. Blotcky was the *only* mental health professional of record to personally examine the claimant and administer psychological tests to help determine the claimant's mental limitations.

The ALJ favorably discussed and relied on the mental assessment portion of Dr. Blotcky's opinion when the ALJ discussed the four criteria in "paragraph B" regarding the limitations imposed by the claimant's mental impairments. Yet, the ALJ found Dr. Blotcky's mental RFC assessment totally inconsistent with his own medical assessment findings and disregarding the doctor's ultimate medical conclusions regarding the claimant's mental limitations. Seemingly, the ALJ picked the portions of Dr. Blotcky's assessment that supported

18

his decision and relied on them, but chose to discredit the parts of his opinion that contradicted the ALJ's findings.  In doing so, the ALJ abused his discretion by "substitut[ing] his own uninformed medical evaluations for those of . . . " a licensed psychologist.  *See Marybury*, 957 F.2d at 840.

The court acknowledges that the ALJ can discredit the findings of a consultative examiner.  However, this court finds that at the point that the ALJ chose to follow part of Dr. Blotcky's assessment regarding his impressions of the claimant but, at the same time, completely rejected Dr. Blotcky's ultimate assessment of the claimant's mental limitations, a serious problem arose.  At that point, the record contained no other medical evidence *from a psychiatrist or psychologist* specifically regarding how the claimant's severe mental impairments limit his ability to work.  The court acknowledges that the ALJ did incorporate the psychiatric review technique in evaluating the claimant's mental limitations. However, the court finds that when the ALJ totally ignored Dr. Blotcky's medical determinations, the ALJ had no substantial evidence from a psychiatrist or psychologist to support his ultimate determination regarding the claimant's mental limitations.

The court understands the province of the ALJ in making credibility assessments and the importance of the claimant's cooperation with the state mental examiners. But despite the claimant's lack of cooperation with the state agency psychologists, the ALJ found that the claimant had many severe mental impairments, including depression, personality disorder, learning disorders in mathematics and written expression, and history of oppositional defiance disorder. Given his findings regarding severe mental impairments, the court cannot ignore the

19

ALJ's decision to make his ultimate finding without reconciling his perceived inconsistencies in Dr. Blotcky's mental assessment of the claimant. To fully develop the record, the ALJ should have re-contacted Dr. Blotcky, who was the only treating source to assess the claimant's mental limitations caused by his severe mental impairments. The ALJ found that Dr. Blotcky's opinion was unclear in that his medical assessment observations conflicted with the doctor's own ultimate findings on the issue of the claimant's mental limitations; at the very least, this court finds that the ALJ should have re-contacted Dr. Blotcky to deal with such inconsistencies before the ALJ chose to significantly rely on a portion of Dr. Blotcky's mental assessment and disregard his ultimate medical finding.

Further, this court finds that, after finding major inconsistencies in Dr. Blotcky's assessment of the claimant's mental limitations and completely rejecting his ultimate findings, the ALJ had a duty to develop the record further and order his own mental assessment of the claimant because no substantial evidence from a psychiatrist or psychologist, other than Dr. Blotcky, existed in the record to support the ALJ's ultimate determination that the claimant did not meet a mental impairment listing. Where an inconsistency exists in the record or the medical record as a whole does not support a determination on the disability claim, the ALJ should order a consultative examination. 20 C.F.R. §§ 416.903(a), 416.919, 416.919a(b). Had he done so after finding inconsistencies in Dr. Blotcky's opinion, the ALJ may have had an actual medical assessment from a psychiatrist or psychologist contradicting Dr. Blotcky's assessment. At that point, the ALJ could have articulated the weight he gave each contradicting assessment and his reasons for his findings.

As it stands, the court finds that substantial evidence does not support the ALJ's finding regarding the claimant's mental limitations, and that the ALJ failed to properly develop the record. This court finds that reversal and remand is warranted for the ALJ to further develop the record, including re-contacting Dr. Blotcky and/or ordering an additional mental assessment from a qualified psychiatrist or psychologist specifically addressing the psychiatric review technique.

*Other Concerns*

This court is concerned about whether the ALJ's opinion is justified in finding that the claimant is not disabled because of the claimant's noncompliance with prescribed treatment. The claimant alleges he cannot afford the prescribed treatment, and the failure to follow prescribed treatment because of poverty may excuse the claimant. *See Ellison v. Barnhart*, 355 F.3d 1272, 1275 (11th Cir. 2003).

The ALJ, in the case at bar, based his determination largely on the claimant's noncompliance with treatment that the claimant argues was a result of his inability to afford prescribed medical treatment. The claimant testified that he could not afford the prescribed treatment without income or insurance. (R. 57-58). The ALJ stated that the claimant can afford to buy cigarettes; however, the ALJ misread the claimant's testimony, as the claimant said his cousin purchases cigarettes for him. (R. 49). Additionally, the ALJ referenced the claimant's mother, grandfather, and aunt paying for his medication, but the court is concerned that reliance on other family members is not substantial evidence to prove the claimant is capable of complying with the prescribed treatment despite his alleged inability to pay. (R. 57). Therefore, this court advises the ALJ to reassess his evaluation in determining whether the claimant's

21

inability to follow the prescribed treatment because of lack of income is a justifiable reason for finding the claimant non-disabled.

## VII. CONCLUSION

For the reasons as stated, this court concludes that substantial evidence does not support the Commissioner's findings regarding the claimant's mental limitations and is due to be REVERSED and REMANDED. The court will enter a separate Order to that effect simultaneously.

DONE and ORDERED this 24th day of September, 2014.

_____
KARON OWEN BOWDRE
CHIEF UNITED STATES DISTRICT JUDGE